**Helena Hilda BUTTERFIELD, Appellant**

v.

**ATTORNEY GENERAL OF the UNITED STATES.**

No. 23993.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1970.

Decided March 10, 1971.

---

Mr. Anthony A. Lapham, Washington, D. C., with whom Mr. William H. Dempsey, Jr., Washington, D. C., was on the brief, for appellant. Mr. Alfred L. Scanlan, Washington, D. C., also entered an appearance.

Mr. Paul C. Summitt, Atty., United States Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty.,
and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

PER CURIAM:

This is an appeal from a judgment of the District Court upholding the administrative denial of appellant's application for a visa preference classification under the Immigration and Nationality Act (8 U.S.C. § 1153(a)).

Appellant is a citizen of Great Britain, born in India of British parents. Apparently, her central aim in life has been to organize and operate an international cultural center. Two such attempts were previously made in London and in Rome, both of which were abortive. In 1962, appellant looked to the United States, hoping to find a more favorable financial climate. However, she was unable to gain immigrant's status because, under the national origins quota system in effect until 1965, she was chargeable to the small and oversubscribed Indian quota rather than to the large and undersubscribed British quota.

Appellant entered the United States on January 8, 1962, on a six-months nonimmigrant visitor's visa. She over-stayed the visa, and was ordered by the immigration authorities to show cause why she should not be deported. A Special Inquiry Officer, after hearing, found her deportable as charged on March 22, 1963.[1] He granted her application for voluntary departure in lieu of deportation and provided that, in the event she failed to depart voluntarily as directed by the District Director, she would be deported to Great Britain. Appellant did not appeal this determination.

Appellant attempted to obtain relief by way of private legislation in Congress, and the authorities agreed not to compel her departure while she pursued this activity. However, when it became obvious that her efforts would be to no avail, appellant was directed to depart the United

---

[1]. Appellant has handled all of the previous administrative and judicial proceedings *pro se*; only on this appeal has she been represented by counsel.

States. Yet she failed to leave as directed; and a deportation warrant was issued.

Appellant ignored directions to report at Los Angeles for deportation on November 27, 1964. In December of 1964 she was discovered working for the Australian Embassy in Washington, D. C. Again, appellant attempted to obtain relief through Congress, and the Immigration Service continued to grant appellant extensions of time.

While the pursuit of private legislation again failed, in 1965 Congress passed liberalizing amendments to the Immigration and Nationality Act of 1952. The national origins quota was abolished, and Congress established an absolute ceiling of 170,000 persons who could enter this country every year, without regard to nationality (8 U.S.C. § 1151(a)). Congress also prescribed a seven-tier preference system to determine the priorities for the world-wide quota. Two of the preferences were based upon the prospective immigrant's vocational abilities. The sixth preference (8 U.S.C. § 1153(a) (6)) was designed to allow skilled and unskilled labor into the country to fill positions in which there were shortages.[2] The third preference, however, was designed to attract members of the professions or persons having special talents or education (8 U.S.C. § 1153(a) (3)).[3] The term "profession" included, but was not limited to, "architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies or seminaries." 8 U.S. C. § 1101(a) (32).

Two qualifications were placed upon those individuals who apply for the sixth preference visa. First, they must be certified by the Secretary of Labor, who is to determine whether a labor shortage exists in the particular occupation that the applicant is seeking to enter, and whether the entrance of the applicant into that area would unduly affect the wages and working conditions of Americans already so employed (8 U.S.C. § 1182(a) (14)). Second, the application for the sixth preference has to be filed by a sponsoring firm or organization rather than the applicant himself (8 U.S. C. § 1154(a)). The latter qualification has been termed the "job offer" requirement. The third preference applicant is subject only to the former qualification.

On January 17, 1966, appellant submitted an application for a third preference visa. She based her application on her intention to operate an "international cultural centre—promoting courses in language, history, literature, musical activities, [and] concerts." She listed her occupation as "President-Director—Educational and Cultural Organization." In conjunction with the certification procedure, appellant identified her profession as teaching, and set forth in detail an account of her teaching experience. In further support of the application, appellant attached a transcript of her academic record at the University of Wales, where she received a B.A. degree in 1951. The Department of Labor reviewed the form and returned it to the Immigration Service bearing the Department's endorsed certification of appellant's eligibility for a third preference visa.

A hearing was held at the office of the District Director on appellant's "pending petition to classify preference status on basis of profession or occupation." While it was appellant's understanding that she was to be interviewed about her profes-

2. "Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a) (ii) of this title, to qualified immigrants who are capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States."

3. "Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a) (ii) of this title, to qualified immigrants who are members of the professions, or who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States."

sional qualifications, she was in fact interrogated about her various business activities over the fifteen year period preceding her application. The transcript of this hearing has been lost by the immigration officials, and the only existing record of it is a memorandum prepared by one of the three INS officials present at the hearing:

> Subject was sworn in and agreed to present testimony concerning her occupation and financial history under oath. She was questioned at great length regarding the operation, financial and otherwise, of her schools in London and Rome and also in regard to the cultural foundation she has operated in the United States. She was also asked about a series of unpaid debts totaling close to $10,000, presently owed by her to many concerns in this country. Subject was evasive, verbose, and vague in regards to most of the questions asked of her. She denied that she was a poor financial manager as is evident from a review of the information contained in the file about her financial operations. She presented * * * a series of rationalizations to account for her past failures and blames ill-fortunes, accidents, illnesses, and bureaucratic regulations and delays as the reasons for her constant inability to succeed in her endeavors.
>
> * * * * * *
>
> The interview evidenced that subject has never operated an accredited school, that she was unable to recollect the financial transactions involved in rooming [sic] the schools and that they have never been within more than, if you please, a "fly by night operation," in the full sense of the term.
>
> She has continuously overextended herself financially and has made commitments which, due to her managerial inability, she has then been unable to meet. This can be shown in the example of the first prize winner of a concert for young artists which she sponsored; the winner was earmarked for an award of $3,000, the amount

subject hoped to derive for entry and registration fees for the contest. When participation was not as she had expected, she was then saddled with yet another financial setback. [I]t is the opinion of the undersigned that subject lacks any business sense and does not have any managerial capacity.

On the basis of this hearing, the District Director denied appellant a third preference visa. Appellant thereupon appealed to the appropriate INS Regional Commissioner who affirmed the decision of the District Director. Adverting to the circumstances described in the memorandum, the Regional Commissioner concluded that appellant "failed to establish that she is financially capable of establishing and operating international culture centers in the United States * *."

Appellant challenged the administrative denial in the District Court, which granted the Government's motion for summary judgment without opinion. Appellant's primary contention on appeal is that the denial of her third preference visa on the basis of her financial distresses was beyond the scope of INS's statutory authority. She argues that the plain language of the statute indicates that the third preference requirement is satisfied if (1) the applicant is found to qualify as a member of a profession, and (2) the pursuit of that occupation will not, in the judgment of the Department of Labor, adversely affect the labor market for Americans already so employed. Appellant asserts that, since these two findings have been made in her case, the statutory inquiry is thereby exhausted.

The Government concedes that appellant is a qualified member of a profession and that she has been properly certified by the Secretary of Labor. It further concedes that neither in the language of the statute nor in any relevant case law is there support for its position that capacity to practice a profession with financial success must be shown before the visa is granted. However, it points out that, in considering the proposed amendments to the Act, Congress was greatly concerned that they might have

an adverse effect on the American labor market. In response to this concern, the certification procedures and the sixth preference "job offer" requirement were added to the proposed amendments while the bills were still in their respective committees.

While the Government is unable to explain the absence of the "job offer" requirement for third preference applicants, it argues that, if the vacuum so created is not filled by INS, the Congressional intent with regard to domestic labor problems will be undermined, since unsuccessful professional people will gravitate towards unskilled work. It urges that it is irrational to construe the statute so as to insure that a third preference applicant will not displace an American professional in a certain occupation, and then allow that immigrant, once having entered the country, access to another area of the labor market in which there are no shortages. Therefore, in order for the Congressional scheme to be properly effected, some control had to be created by INS to insure that immigrant professionals actually perform the job for which they are qualified and certified. The control which INS chose was an investigation of the applicant's intention and capacity to practice successfully the profession for which he was to be admitted.

An examination of the legislative history, however, suggests that Congress did not deem such control necessary to the effectuation of its purpose. The absence of any control for the potential shifting of professionals into areas without labor shortages is explained by a general lack of concern about the problem because of the minor impact such shifting would have on the American labor force. The then Secretary of Labor, supporting the amendments, testified as follows before the Senate Subcommittee on Immigration and Naturalization:

> Secretary Wirtz: [I]n the fifth year of operation of this law as nearly as we can determine, I think we are going to find that there will be about 11,000, at least 11,000 professional and technical people coming into this country under this law in occupations, in professional and technical areas where we need them. \* \* \*
>
> \* \* \* \* \* \*
> \* \* \* We are playing with small numbers as far as the present and future bill are concerned. I think that is important because there has been some impression that we are letting down the floodgates. We are not, \* \* \*

Hearings on S. 500 before the Senate Subcommittee on Immigration and Naturalization, 89 Cong., 1st Sess. (1965), at 101.

In addition to the fact that the total number of third preference immigrants entering the country each year would be small compared to the total domestic work force, it was also recognized that such highly trained individuals would not be inclined to shift occupations. Congressman Moore of West Virginia made the following observation before the House Subcommittee:

> Congressman Moore: \* \* \* I think this is probably a fair interpretation of your statement, Mr. Secretary, you have faith in the individual that he is going to use his education, and that the character and the background of the individual are such that he would not be inclined to drift, and, therefore, he would want to put his skill to work. \* \* \*

Hearings on H.R. 2580 before Subcommittee No. 1 of the House Judiciary Committee, 89th Cong., 1st Sess. (1965), at 126.

Finally, the testimony of various representatives of the AFL–CIO, the organization chiefly responsible for the certification and job offer requirements, indicates that, while there was fear of the "shifting" which might take place in what would now be considered sixth preference areas, there was little fear with regard to the professional occupations.

Therefore, there was no insistence on the part of organized labor that the "job requirement" be utilized for the third preference applicants. Typical is the testimony of Kevin Butler, a representative of the AFL–CIO:

> Mr. Butler: * * * Now certainly, so far as professionals are concerned, scientists, teachers, we find little problem [about the absence of the job offer requirement]. But so far as machinists or tool or diemakers, as we have indicated in our testimony, are concerned, here we do have some concern [about such an absence].

Hearings on S. 500 before the Subcommittee on Immigration and Naturalization of the Senate Judiciary Committee, 89th Cong., 1st Sess. (1965), at 644.

It thus appears that Congress did not intend that a third preference visa applicant needed to do more than to show a status as a qualified member of a profession—a status which the Government concedes to appellant—and to receive a certification from the Labor Department, which appellant did. She was not required to demonstrate that she would at all events be financially successful in the practice of her professional calling, and she could not be denied the preference solely because of doubts, however soundly rooted in past experience, on this score.

We, accordingly, reverse the judgment of the District Court and remand with directions that a judgment be entered declaring her entitlement to the third preference visa.[4]

It is so ordered.

4. The granting of the third preference status to appellant in no way affects the outstanding deportation order against her. It does enable her to invoke the discretion of the Attorney General to adjust her status under the following provision of the Act:
   "The status of an alien, other than alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under

such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is approved."
8 U.S.C. § 1255(a).